Filed 7/23/14  P. v. Martinez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062720 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS247733) |
| JAMES MARTINEZ, et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Ana Espana, Judge.  Judgment affirmed in part, reversed in part.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant James Martinez.

Martha L. McGill, under appointment by the Court of Appeal, for Defendant and Appellant Sean O'Neill.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

In July 2012, a jury convicted James Martinez and Sean O'Neill of the attempted murders of Robert Romero and Chula Vista Police Department (CVPD) Agent Ricardo Cruz (Pen. Code, §§ 187, subd. (a), 664)[1] (counts 1 and 2, respectively), assault with a deadly weapon on a peace officer (§ 245, subd. (c)) (count 3), resisting an executive officer (§ 69) (count 4), and evading an officer with reckless driving (Veh. Code, § 2800.2, subd. (a)) (count 5). The jury also found that Martinez and O'Neill committed each of the five felonies for the benefit of a criminal street gang, within the meaning of section 186.22, subdivision (b)(1).

As to count 1, the attempted murder of Romero, the jury found that both Martinez and O'Neill committed the crime willfully, deliberately and with premeditation, within the meaning of section 189. The jury also found that each was a principal in the offense, that at least one principal personally used and discharged a firearm within the meaning of section 12022.53, subdivisions (b) and (e)(1), and that the firearm caused great bodily injury within the meaning of section 12022.53, subdivision (d). As to count 2, the attempted murder of Agent Cruz, the jury found that Martinez and O'Neill knew that Agent Cruz was a peace officer performing his duties within the meaning of section 664, subdivision (e), and that Martinez personally used a car as a deadly weapon within the meaning of section 12022, subdivision (b)(1). The jury also found that Martinez

---

[1]     Unless otherwise indicated, all subsequent statutory references are to the Penal Code.

personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a), with respect to counts 2, 3 and 4.

In bifurcated proceedings, the court found that Martinez had one strike prior and that O'Neill had one prison prior. The court sentenced Martinez to a total determinate term of 13 years, plus consecutive indeterminate terms of 85 years to life and life with the possibility of parole. The court sentenced O'Neill to a total term of four years, plus 15 years to life with the possibility of parole, plus 25 years to life with the possibility of parole.

On appeal, each defendant raises several claims of error. Martinez contends that (1) there was insufficient evidence that he intended to kill Agent Cruz to support his conviction on count 2; (2) the court erred by not instructing the jury that implied malice cannot support a finding of intent to kill; (3) the court should have stayed his sentence on count 5 because evading Agent Cruz and the attempted murder of Agent Cruz constituted a continuous course of conduct; and (4) the aggregate sentence of 98 years plus a life term is cruel and unusual punishment under the state and federal constitutions. O'Neill contends that there is insufficient evidence to support his conviction on count 1 as an aider and abettor, and that there is insufficient evidence to support his convictions on the remaining counts based on a theory of natural and probable consequences. Martinez and O'Neill also raise claims of sentencing error.

For the reasons explained in Section III.A.5., *post*, we modify the trial court's sentence on count 1 as to Martinez and otherwise affirm the judgment as to him. As to O'Neill, we affirm his conviction on count 1. However, we agree with his contention that

3

the evidence was insufficient to support his conviction on counts 2 through 5 and we therefore reverse the judgment as to him on those counts.

## II.

## FACTUAL BACKGROUND

*A. The Peoples' Evidence*

At approximately 1:00 a.m. on April 23, 2011, Robert Romero stepped outside of Wild Woolly's bar on the corner of Broadway and Davidson in Chula Vista to make a phone call. Romero walked across the street to get away from the noise from the bar. After crossing the street, Romero saw two, or possibly three, men walk out from the alley behind the bar, coming toward him. As the men approached, one asked Romero "Where are you from?" and said "Fuck VCV." Before Romero could respond, one of the men shot Romero twice in the chest. Romero fell to the ground. The men continued to approach Romero as he crawled backward, yelling at the shooter to stop. The same man shot Romero three more times, in the side, stomach and leg. The men then ran away. At trial, Romero testified that he could not identify the shooter, but said that the man's size and skin color matched Martinez's. One of the bullets pierced both of Romero's lungs and one of his lungs collapsed. Two bullets remain lodged in Romero's back and one is his left leg. Romero was hospitalized for almost a month. At the time of trial, he continued to experience constant pain.

After the perpetrators fled, Romero managed to stand up and begin walking back toward Wild Woolly's. Around the same time, Agent Cruz was patrolling the area near Wild Woolly's and saw a crowd gathering at the intersection of Broadway and Davidson.

4

Agent Cruz turned onto Davidson, where a bystander told him that someone had been shot. As Agent Cruz was asking the bystander for more information, Romero walked up to Agent Cruz's car and pulled open his shirt, revealing the gunshot wounds. Romero told Agent Cruz that he had been shot. As Agent Cruz picked up his microphone to call for help, several members of the crowd were pointing to East Park Lane, the alley behind the bar where cars were parked. Agent Cruz told Romero that help was on the way and then drove toward the alley, where he saw a car's brake lights, and then its reverse lights, turn on. Agent Cruz could hear people in the crowd shouting "That's the car. They are over there. They are in that car."

Agent Cruz followed the car as it headed north on East Park Lane. When Agent Cruz caught up with the car, a white Toyota Solara, he turned on his police cruiser's overhead lights. The Solara did not pull over. As Agent Cruz continued following the car, he radioed the direction of travel and a description of the Solara and its license plate number. The Solara ran through a stop sign, but then slowed down as Agent Cruz approached. Fearing an ambush, Agent Cruz hung back. The car then abruptly accelerated to 30 or 40 miles per hour. Agent Cruz followed the Solara, maintaining a distance of 10 to 15 yards. The Solara turned onto Beech Avenue and Agent Cruz again radioed the direction of travel and turned on his siren. The Solara sped through two more stop signs and bottomed out twice, sending sparks from under the car. The Solara then turned onto Madrona Street, a cul-de-sac, and drove slowly down the street and around the loop.

5

Agent Cruz followed the Solara onto Madrona, but stayed in the straight part of the road, facing the loop. Agent Cruz stopped his car close to the left side of the street, next to a parked truck. Agent Cruz positioned his patrol car so that the driver of the Solara would be forced to exit the loop of the cul-de-sac on the right, passing the patrol car on its passenger side, if he attempted to flee. When Agent Cruz pulled his car into position, the Solara stopped and faced him. Agent Cruz saw a male driver and O'Neill in the passenger seat. Agent Cruz testified that he made eye contact with both men and that neither man reacted or showed any emotion. The driver of the Solara pulled the car out of Agent Cruz's field of vision. Agent Cruz got out of his patrol car so that he could see the Solara. The Solara was facing Agent Cruz. Agent Cruz again made eye contact with both men, drew his gun and pointed it at the driver. Agent Cruz shouted repeatedly at the men to show their hands and turn off the car.

The driver of the Solara revved the car's engine and drove directly at Agent Cruz. Agent Cruz fired his gun at the car five times in rapid succession. The Solara remained on its path toward Agent Cruz, who attempted to take cover inside his patrol car. The Solara hit the driver's side door of Agent Cruz's patrol car, which in turn hit Agent Cruz and sent him head first into the roof of the patrol car. Agent Cruz momentarily lost consciousness. The Solara ran over Agent Cruz's leg and foot, crushing part of his leg between the car door and frame. Agent Cruz radioed for help. He saw the Solara behind him, heading out of the cul-de-sac. CVPD officer, Eric Thunberg, responded to Agent Cruz's call and headed to Agent Cruz's location. Thunberg saw the Solara make a wide right turn onto Beech from Madrona. He later identified Martinez as the driver of the car.

6

Because Thunberg had just heard Agent Cruz's radio call reporting that he was hurt, Thunberg went to assist Agent Cruz rather than pursue the Solara.

Agent Cruz's injuries included a broken left foot, crushed shin, soft tissue damage to his left knee, hip and right arm, a concussion, bruises on his face, head and chest and cuts to his right arm and chest from the patrol car's door. Agent Cruz continued to experience pain and discomfort at the time of the trial.

Shortly after Agent Cruz left Wild Woolly's to pursue the Solara, another police officer arrived at the bar. He saw a crowd outside and Romero lying on the ground. Someone in the crowd shouted that one of the men who had approached Romero was wearing a Padres jacket. Romero could not recall what the suspects had been wearing. Additional police officers arrived to contain the scene and begin an investigation. Six .22 caliber ammunition rounds, including one unfired cartridge and five fired casings, were found in a dumpster in the alley next to Wild Woolly's. The bar's video surveillance footage from the timeframe of the shooting showed two people walking out of the alley and then running back down the alley. The video also showed someone opening the dumpster and placing something inside. In addition, the video had footage of Agent Cruz's patrol car turning down the alley and proceeding northbound. After cordoning off the path of Agent Cruz's pursuit, police found a knife and a loaded revolver in the gutter.

Fingerprints were found on the gun, but they did not have enough detail to be identified. When tested, the gun fired only intermittently. It was determined that the expended cartridges found in the dumpster had come from the revolver that police found in the gutter. Martinez's brother was the owner of the Solara. When questioned by police

7

on the morning of April 23rd, he told the officers that Martinez had borrowed the car the night before and had not yet returned it. The Solara was found later that day, parked in a walkway near a church. There was a bullet hole in the hood of the car. Inside the car, police found a box containing .22 caliber cartridges that were consistent with the casings found in the dumpster. O'Neill's fingerprints were found on the Solara's passenger's side door and Martinez's palm print was found on the hood. Investigators also found Martinez's DNA on the steering wheel and the driver's side door, and on a nearby picnic table and wall. Additionally, a Vons receipt for a six-pack of beer dated April 22 at 7:39 p.m., which police found near the Solara, corresponded with video surveillance footage from Vons that depicted two men dressed like the men seen running down the alley in the Wild Woolly's surveillance video. One of the men shown on the recording was wearing clothing that matched the clothing found in O'Neill's home.

At trial, CVPD detective Bryan Maddox testified as an expert on criminal street gangs. Maddox identified both O'Neill and Martinez as longtime members of the Otay criminal street gang.[2] Maddox testified that the Otay gang is a rival of the Varrio Chula Vista street gang, or VCV, which claims Wild Woolly's as part of its territory. He stated that gang members go into rival gang territory to commit crimes and to expand their own territory. According to Maddox, because of the danger associated with going into rival territory, gang members on such missions might not wait to find a known rival gang

---

[2]  Both men had admitted to being Otay members and they were documented as gang members by the CVPD, as well. O'Neill also stipulated to being a gang member. He has multiple gang-related tattoos, including one on his head that reads "fuck CV" and another across his stomach that says "Otay."

member to assault. Instead, they assault anyone who they think may be associated with the rival gang.

Maddox told the jury that committing a crime involving a police officer, even just running away from police, is a crime that elevates a gang member's status. Further, "[c]ommitting a violent assault against [a law enforcement] officer, [particularly] on the heels of committing another violent assault, . . . is considered the cream of the crop when it comes to gang crimes… ." Maddox testified that murders of rival gang members and police officers, as well as evading police, are crimes that are committed for the benefit of the gang.

*B. The defense*

Defense counsel argued that neither Martinez nor O'Neill was involved in the shooting of Romero. Both counsel stressed that there were no eye witnesses to the shooting. Defense counsel posited that the shooter could have been an enemy of Romero who had recently been released on bail for alleged heroin distribution, and who had also recently testified as a witness in a murder trial. With respect to the attempted murder of Agent Cruz, Martinez's counsel argued that Martinez was merely trying to evade Agent Cruz and did not intend to harm him. Counsel theorized that Martinez tried to evade Agent Cruz because he feared being caught drinking and driving, particularly because he was not yet 21. Martinez's counsel told the jury that Martinez had driven toward Agent Cruz, rather than around him, because he was trying to avoid being shot by Agent Cruz. O'Neill's counsel contended that there was no reliable evidence that O'Neill was in the car at the time it hit Agent Cruz, and that even if O'Neill was in the car, the prosecution

9

failed to establish that O'Neill had done anything that would make him liable as an accomplice to the crimes.

III.

DISCUSSION

*A. Martinez's Appeal*

> *1. The evidence is sufficient to support Martinez's conviction for the attempted murder of Agent Cruz*

In reviewing a claim of insufficiency of the evidence, this court's role is limited. " ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738.) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) " 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943.)

Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Ervine* (2009) 47 Cal.4th 745, 785.) Attempted murder also requires express malice, meaning

10

that the assailant desires the victim's death or knows to a substantial certainty that the victim's death will occur. (*People v. Booker* (2011) 51 Cal.4th 141, 178 (*Booker*).) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' [Citation.]" (*People v. Smith*, *supra*, 37 Cal.4th at p. 739.) In contrast, a murder conviction may be based on implied malice. "Implied malice does not require an intent to kill. Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)

Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*People v. Smith, supra*, 37 Cal.4th at p. 741.) " 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.' " (*Ibid.*) "Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946.)

Martinez contends that the record does not contain substantial evidence that he harbored the specific intent to kill Agent Cruz. He argues that, at most, only implied malice can be inferred from his actions, and that this is insufficient to support his conviction for attempted murder.

Agent Cruz testified that once the Solara was stopped at the end of the cul-de-sac and was facing Agent Cruz's patrol car, Agent Cruz got out of the patrol car, drew his gun and yelled repeatedly at Martinez and O'Neill to show their hands and get out of the car.

11

Rather than surrender, according to Agent Cruz, Martinez revved the Solara's engine and drove directly at Agent Cruz. Agent Cruz fired his weapon and then attempted to take cover inside the patrol car. Because of the speed of the oncoming car, Agent Cruz was hit by the Solara before he was completely inside his patrol car.

Martinez argued at trial, and reiterates on appeal, that he "drove forward out of the cul-de-sac, not necessarily intending to kill Agent Cruz but to escape from law enforcement and to avoid being shot and killed by the officer." He contends that the prosecution's evidence does not support a finding of an intent on his part to kill Agent Cruz because, "by driving at Cruz, [Martinez] had a better chance of scaring Cruz or possibly injuring him, thereby enabling Martinez to escape with his life."

We reject Martinez's argument that the evidence was insufficient to support the jury's finding of actual malice. Martinez's argument does not undercut the prosecution's evidence. Rather, it amounts to an alternative theory about his state of mind when he drove directly at Agent Cruz—a fact that he does not dispute. Martinez's counsel presented this theory to the jury, which rejected it. The jury's finding that Martinez intended to kill Agent Cruz by driving directly at him was reasonable.[3] Agent Cruz's

---

[3]    As in *Booker, supra,* 51 Cal.4th 141, the case that Martinez attempts to distinguish, the totality of the evidence here was sufficient to sustain the attempted murder conviction. In *Booker*, the court held that the jury's conclusion that the defendant was substantially certain death would result was reasonable, based on the defendant's awareness that a three-month-old infant was asleep and alone in the apartment when he placed flammable materials on a stove and turned it on. (*Booker*, at p. 178.) The jury's conclusion that Martinez either intended to kill Agent Cruz or was substantially certain that Agent Cruz's death would result, is similarly reasonable based on the fact that once he was cornered in the cul-de-sac, instead of surrendering, Martinez drove the Solara directly at Agent Cruz.

testimony concerning Martinez's actions supports the jury's determination, and it is not this court's function to reweigh the evidence. (*People v. Nelson* (2011) 51 Cal.4th 198, 210 [" '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility"].)

> 2. *The trial court was not required to instruct sua sponte on the definition of implied malice*

Martinez contends that the trial court erred by failing to provide the jury with the definition of implied malice and failing to specifically instruct the jury that implied malice cannot support a conviction for attempted murder. He argues that absent such instructions, "the jury was unable to distinguish between the conduct/mental state which constitutes implied malice versus express malice or specific intent to kill." According to Martinez, the "unique facts of this case require[d] the jury's understanding of the subtle dividing line between 'intent to kill' and the conduct/mental state that amounts only to implied malice." Martinez argues that, at most, he harbored implied malice and that if the court had instructed the jury on the distinction, it is likely that the jury would have found that he lacked express malice and thus would not have convicted him of attempted murder.

The trial court instructed the jury that to find a defendant guilty of attempted murder on count 2, "that person must not only intentionally commit the prohibited act, but must do so with a specific intent and/or mental state. The act and the specific intent and/or mental state required are explained in the instruction for that crime…." The court

13

then instructed the jury pursuant to the standard instruction on attempted murder (CALCRIM No. 600). The instruction stated that the prosecution was required to show that Martinez "took at least one direct but ineffective step toward killing (another person . . . )" and that he "intended to kill that person."

The instruction also stated that "[a] direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt. [¶] A person who attempts to commit murder is guilty of attempted murder even if, after taking a direct step toward killing, he or she abandons further efforts to complete the crime, or his or her attempt fails or is interrupted by someone or something beyond his or her control. On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing the murder, then that person is not guilty of attempted murder." (CALCRIM No. 600.)

We conclude that the trial court was under no duty to instruct the jury on the definition of implied malice. "A trial court has a sua sponte duty to 'instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case… .' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 845-846.) The definition of implied malice, in the context of this case, was not necessary

14

for the jury's understanding of its duty to determine whether Martinez intended to kill Agent Cruz. The instructions provided were explicit and clear that in order to convict Martinez on count 2, the jury was required to find that he intended to kill Agent Cruz.

Further, implied malice was not an element of any of the crimes that Martinez was charged with committing. As noted, implied malice cannot support a conviction for attempted murder. Therefore, the implied malice instructions that Martinez contends were necessary—but that his counsel did not request at trial—had the potential to confuse the jury. (See e.g., *People v. Santascoy* (1984) 153 Cal.App.3d 909 ["Nothing less than a specific intent to kill must be found before a defendant can be convicted of attempt to commit murder, and the instructions in this respect should be lean and unequivocal in explaining to the jury that only a specific intent to kill will do"]. ) We conclude that the court did not err in not providing the jury with an instruction defining implied malice.[4]

> *3. The trial court could have reasonably determined that Martinez entertained separate and distinct intents and objectives with respect to the offenses charged in counts 2 and 5*

Martinez next contends that the sentence imposed for his conviction on count 5, evading a pursuing police officer with reckless driving (Veh. Code, § 2800.2), should be stayed pursuant to section 654. He argues his conduct of evading Agent Cruz and the attempted murder of Agent Cruz were part of one continuous course of conduct with the single objective of evading law enforcement.

---

[4] Because we conclude that the trial court had no duty to instruct the jury in the manner that Martinez suggests on appeal, his trial counsel's failure to request such instructions did not constitute ineffective assistance. (See *Strickland v. Washington* (1984) 466 U.S. 668, 689 [The failure to raise unwinnable issues does not constitute ineffectiveness].)

15

Section 654 provides in relevant part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

Section 654 prohibits multiple punishment where a single criminal act or omission violates more than one penal statute. This statutory prohibition has been extended to cases in which an indivisible course of conduct with a single objective violates several different penal statutes. (See *Neal v. State of California* (1960) 55 Cal.2d 11, 19.) "If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct. [Citation.]" (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525.)

The absence of an express finding from a trial court concerning the potential applicability of section 654 does not mandate reversal on appeal. (See *People v. Coleman* (1989) 48 Cal.3d 112, 162.) Rather, we review the trial court's implicit determination that section 654 does not apply, and we determine whether there is substantial evidence to support the trial court's finding. (See *People v. Osband* (1996) 13 Cal.4th 622, 730-731; *People v. Andra* (2007) 156 Cal.App.4th 638, 640 [in reviewing

16

section 654 claim, "[t]he defendant's intent and objective present factual questions for the trial court, and its findings will be upheld if supported by substantial evidence"].)

Without analysis, Martinez asserts that his actions, "at all times, including his act of driving on the sidewalk to exit the cul-de-sac on Madrona Street, indicate a clear and unambiguous single intent to evade law enforcement. Thus, [his] alleged act of evading an officer with reckless driving and the act of attempted murder were part of an indivisible course of conduct with a single objective, for purposes of section 654." The People respond that the record supports the court's conclusion that Martinez had different intents and objectives with respect to the two crimes.

In attempting to refute this contention in his reply brief, Martinez proceeds on the assumption that there was insufficient evidence to support his conviction for attempted murder, as discussed in Section III.A.1, *ante*, and that both crimes—evading an officer with reckless driving and attempted murder—were committed with the sole intent of evading arrest. We disagree. As discussed, the jury's finding that Martinez had the specific intent to kill Agent Cruz is supported by sufficient evidence. The evidence was therefore also sufficient to support the court's implied finding that Martinez had two objectives, i.e., to evade arrest, and then, when he was cornered in the cul-de-sac and decided to drive directly at Agent Cruz, an intent to kill Agent Cruz. We therefore conclude that the trial court was not required to stay Martinez's sentence on count 5 under section 654.

17

*4. Martinez's sentence does not constitute cruel and unusual punishment*

The trial court sentenced Martinez to a determinate term of 13 years, plus two life sentences with a minimum period of 55 years before eligibility for parole.[5] Martinez argues that this is the functional equivalent of a sentence of life without parole, and that because of his relative youth and the nature of the offenses, the sentence is cruel and unusual in violation of both the state and federal Constitutions. Martinez did not raise this issue in the trial court. Although Martinez "has technically forfeited the issue on appeal because he did not raise the objection below [citation], we 'shall reach the merits under the relevant constitutional standards, in the interest of judicial economy to prevent the inevitable ineffectiveness-of-counsel claim.' " (*People v. Russell* (2010) 187 Cal.App.4th 981, 993.)

Article I, section 17 of the California Constitution provides: "Cruel or unusual punishment may not be inflicted. . . ." A prison sentence violates article I, section 17, if it is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.) In applying this test, we look to (1) the nature of the offense and the offender; (2) a comparison with the penalty for more serious crimes in the same jurisdiction; and (3) a comparison with punishment imposed for the same offense in different jurisdictions. (*Id*. at pp. 425-427.) The "[d]efendant must overcome a

---

5       Martinez states in his briefing on appeal that the minimum period before eligibility for parole is 85 years. However, as discussed in the following section, by operation of section 12022.53, subdivision (e)(2), the enhancement of a minimum period of 30 years before eligibility for parole under section 186.22 is stayed.

'considerable burden' to show the sentence is disproportionate to his level of culpability. [Citation.] Therefore, '[f]indings of disproportionality have occurred with exquisite rarity in the case law.' " (*People v. Em* (2009) 171 Cal.App.4th 964, 972.)

The Eighth Amendment, which applies to the states through the Fourteenth Amendment to the United States Constitution, prohibits cruel and unusual punishments. It "contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing v. California* (2003) 538 U.S. 11, 20.) The Eighth Amendment " 'does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Id*. at p. 23.) As with claims under our state Constitution, in determining whether a sentence violates the federal constitutional guarantee against cruel and unusual punishment, a court may consider "the gravity of the offense and the harshness of the penalty." (*Solem v. Helm* (1983) 463 U.S. 277, 292.) "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences [under the federal Constitution are] . . . exceedingly rare." (*Rummell v. Estelle* (1980) 445 U.S. 263, 272.)

Martinez maintains that his sentence constitutes cruel and unusual punishment because "he committed the instant offenses at a relatively young age—just 12 days after his 20th birthday." He contends that the reasoning in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), *Miller v. Alabama* (2012) 567 U.S. __ , 132 S.Ct. 2455, 2470 (*Miller*) and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), all of which prohibit the

19

imposition of life sentences on juvenile offenders, apply to this case.[6] However, Martinez was 20 years old, not a juvenile, at the time he committed the crimes charged in this case.

While youth is a consideration in the disproportionality analysis (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 570), it does not serve as a basis to conclude that Martinez's sentence is unconstitutional. No case has held that a 20-year-old adult is similarly situated to a minor for purposes of determining whether a sentence is cruel or unusual. Martinez has also not presented any evidence that he "was an unusually immature youth and did not foresee the risk he was creating" by committing these crimes. (*People v. Thompson* (1994) 24 Cal.App.4th 299, 306.) In sum, the constitutional prohibition against sentencing juvenile offenders to life without the possibility of parole solely for a nonhomicide offense is not applicable here. (*Cf. Graham, supra*, 560 U.S. 48; *People v. Mendez* (2010) 188 Cal.App.4th 47.)

Martinez also argues that his sentence constitutes cruel and unusual punishment because it is disproportionate to the crimes that he committed, particularly in light of his relative youth and "minimal criminal history." He states that his "prior juvenile offenses, involving five separate incidents, are primarily theft-related offenses and [did] not

---

6     *Graham* prohibits the imposition of a life sentence without the possibility of parole on juveniles for nonhomicide offenses. (*Graham*, 560 U.S. at p. 82.) *Miller* expanded on the principles set forth in *Graham* and held that "*mandatory* life without parole for those under the age of 18 at the time of their crimes violates the Eight Amendment's prohibition on 'cruel and unusual punishments.' " (*Miller*, 132 S. Ct. at p. 2460, emphasis added.) *Caballero* held that the imposition of a life sentence with a parole eligibility date that falls outside a juvenile defendant's natural life expectancy is impermissible under *Graham*. (*Caballero*, 55 Cal.4th at p. 265.)

involve actual injury to any persons." Martinez also points out that his adult criminal history consists of one prior strike conviction that he incurred when he was 16, that also did not involve actual injury to any persons. As discussed, Martinez's age does not provide a basis for finding that his sentence violates the state or federal prohibition on cruel and unusual punishment.

Further, Martinez's prior criminal history is far from minimal. The fact that he has not previously injured anyone does not negate the seriousness of his prior criminal acts or the danger that he poses. Martinez's strike prior, for which he was on parole for at the time of the instant crimes, was carjacking with a firearm. His prior crimes as a juvenile include multiple burglaries, robbery, possession of a knife, resisting an officer and vandalism. In any event, the lack of a significant criminal record is not determinative. (*People v. Martinez* (1999) 76 Cal.App.4th 489, 497.) While the current offenses did not result in the death of either victim, this fortuitous fact does not diminish the extremely serious nature of the crimes that Martinez committed.

This is not one of the extreme and exceedingly rare cases where the sentence is grossly disproportionate to the offense. (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001, 1005 [upholding life sentence without parole for possession of a large amount of drugs by a first-time felon]; *Ewing v. California*, *supra*, 538 U.S. at pp. 19-20, 28 [holding California's "Three Strikes" sentence of 25 years to life for $1,200 felony theft with prior thefts and burglary, was not cruel and unusual]; *Rummell v. Estelle*, *supra*, 445 U.S. 263 [upholding life sentence for a recidivist thief].) Martinez's claim of cruel and unusual punishment thus fails.

21

*5. The trial court erred by imposing both the penalty provision of section 186.22 and the firearm enhancement under section 12022.53, subdivisions (d) and (e)(1) on count 1*

The jury convicted Martinez of attempted murder (count 1) and found true the allegation that a principal personally used a handgun during the offense, within the meaning of section 12022.53, subdivisions (d) and (e)(1). The jury also found that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang under section 186.22, subdivision (b)(1). At sentencing, the trial court imposed a term of life in prison with the possibility of parole, with a minimum 30-year parole eligibility term under section 186.22, subdivision (b)(5),[7] plus an additional consecutive term of 25 years to life under section 12022.53, subdivisions (d) and (e)(1). Martinez contends that the trial court erred by imposing penalties under both sections 186.22 and 12022.53, because of the limitation set forth in subdivision (e)(2) of the latter.

The People concede that the trial court erred in this regard, but contend that the 30-year parole eligibility period should be stayed and not, as Martinez requests, stricken. We accept the People's concession and agree that the sentence should be stayed.

"Section 12022.53, subdivision (e)(1) increases the scope of potential liability for firearm use in a case where there is a finding pursuant to section 186.22." (*People v. Salas* (2001) 89 Cal.App.4th 1275, 1281.) Section 12022.53, subdivision (d), the firearm use provision applicable to the present case, requires the imposition of a 25-year-to-life sentence consecutive to the sentence imposed for the underlying felony when the accused

---

[7]    Section 186.22, subdivision (b)(5), requires a minimum parole eligibility period of 15 calendar years. That term was doubled to 30 years because of Martinez's strike prior.

22

"personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death." (§ 12022.53, subd. (d).) Where, as here, findings have been made pursuant to section 186.22, section 12022.53, subdivision (e)(1), creates an exception to the personal use requirement of section 12022.53, subdivisions (b) through (d). (§ 12022.53, subd. (e)(1).) If a finding under section 186.22 is made, section 12022.53 applies if any principal, not just the accused, personally used a firearm in the commission of the underlying felony. (*People v. Salas, supra*, 89 Cal.App.4th at p. 1281.) "However, as a consequence of this expanded liability under section 12022.53, subdivision (e), the Legislature has determined to preclude the imposition of an additional [sentence] enhancement under section 186.22 . . . unless the accused *personally* used the firearm." (*Salas,* at pp. 1281–1282.)

The People concede that the jury did not find that Martinez personally used a firearm. Rather, the jury found only that "a principal" personally used a firearm in the commission of the offense charged in count 1. Section 12022.53, subdivision (e)(2), therefore prevents the trial court from executing both the penalty under section 12022.53, subdivisions (d) and (e)(1), and the penalty provided by section 186.22, subdivision (b)(5).

With respect to whether the second penalty should be stayed or stricken, we conclude that when a jury makes a section 186.22 enhancement finding, and section 12022.53, subdivision (e)(1) also applies, section 12022.53, subdivision (e)(2), permits the trial court to impose and stay the section 186.22 enhancement, unless the personal use or discharge criterion in section 12022.53, subdivision (e)(2) is met. (See *People v.*

23

*Gonzalez* (2008) 43 Cal.4th 1118, 1129 ["section 12022.53 was enacted to ensure that defendants who use a gun remain in prison for the longest time possible and that the Legislature intended the trial court to stay, rather than strike, prohibited enhancements under section 12022.53"]; *People v. Sinclair* (2008) 166 Cal.App.4th 848, 854 [concluding section 12022.53, subdivision (e)(2), authorized the trial court to impose and stay gang enhancement under section 186.22 where defendant did not personally use a firearm].) The judgment is modified to stay the 30-year minimum parole eligibility term under section 186.22, subdivision (b).

*B. O'Neill's Appeal*

*1. Sufficiency of the evidence to support O'Neill's conviction for aiding and abetting the attempted murder of Romero*

A person aids and abets the commission of a crime when he acts with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of encouraging or facilitating the commission of the crime, and his act or advice in some manner aids, promotes, encourages or instigates the commission of the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 560-561.) Neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aider and abettor liability. (See *People v. Durham* (1969) 70 Cal.2d 171, 181; *In re Jose T.* (1991) 230 Cal.App.3d 1455, 1460.) However, mere presence at the scene of a crime may be considered together with other meaningful evidence, such as companionship and conduct before and after the offense, in assessing aider and abettor liability. (*In re Lynette G.* (1976) 54 Cal.App.3d 1087.)

24

"Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.) In determining whether the evidence in this case was sufficient to support the jury's verdict that O'Neill aided and abetted the attempted murder of Romero, we view the evidence, and draw all inferences, in the light most favorable to the judgment. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208; *People v. Pre, supra,* at p. 421.)

O'Neill contends that there was no evidence that he assisted or encouraged the attempted murder of Romero, or that he even knew that Martinez intended to shoot Romero. We disagree. The evidence showed that O'Neill purchased beer with Martinez hours before the shooting and accompanied Martinez into rival gang territory, where one of the men issued a verbal challenge to Romero before Martinez shot him. O'Neill then fled the scene with Martinez.

While the evidence of O'Neill's conduct during the commission of the shooting is thin, we conclude that it is sufficient to support the finding that O'Neill aided and abetted the attempted murder of Romero. Like the defendant in *People v. Campbell* (1994) 25 Cal.App.4th 402, O'Neill "did not independently happen by the scene of the crime." (*Ibid.*) Rather, Martinez *and* O'Neill knowingly approached and challenged Romero, acting in concert. O'Neill stood by as Romero took five bullets. Martinez and O'Neill then fled the scene together.[8]

---

[8]    While that flight, alone, would not be sufficient to support O'Neill's conviction, it is a relevant factor in determining his consciousness of guilt. (*People v. Chagolla* (1983) 144 Cal.App.3d 422, 429.)

25

Additionally, the testimony of the prosecution's gang expert supported the prosecutor's theory that O'Neill and Martinez went into rival gang territory together, with the intention of shooting a member or members of a rival gang, on behalf of their own gang. Since there was no evidence that O'Neill "was surprised by" Martinez's "conduct or [that he was] afraid to interfere with [Martinez], the jury could reasonably conclude" that O'Neill was there to participate and intimidate Romero.[9] (*People v. Campbell, supra*, 25 Cal.App.4th at p. 410.)

---

[9] The cases on which O'Neill relies, *Pinell v. Superior Court of San Francisco* (1965) 232 Cal.App.2d 284 (*Pinell*) and *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262 (*Juan H.*) do not persuade us otherwise. In *Pinell* the victim was attacked and abducted by two men and was taken to the petitioner's home, where she was sexually assaulted by the men who abducted her. (*Pinell*, at p. 286.) The victim was subsequently taken to the petitioner's room. The petitioner did not harm her, expressed anger at the two perpetrators and helped the victim by bandaging her bleeding eye and telling her to check her purse before leaving. (*Id*. at p. 288.) There was no evidence that the petitioner was aware of the actions of the other two men before they brought her to the petitioner's home. (*Ibid.*) Further, while the two perpetrators fled the scene, petitioner stayed in his home. (*Ibid.*) Here, the evidence showed that O'Neill and Martinez purchased beer together hours before the crime, approached Romero together, and fled the scene of the shooting together.

While *Juan H.* is closer factually to this case, it is still distinguishable and, in any event, is not binding authority on this court. There, two shots were fired at the trailer where Juan H. and his family lived. (*Juan H.*, 408 F.3d at p. 1266.) About one-and-a-half hours later, Juan and his older brother, Felix Merendon, were outside in the trailer park and approached two men whom they suspected of shooting their trailer. (*Ibid.*) Merendon asked the men whether they had shot the trailer and one of the men responded that he did not know what Merendon was talking about. (*Id*. at p. 1267) Merendon immediately pulled a shotgun from his pants and shot the man, who later died. (*Ibid.*) Merendon fled in his car, and Juan H. ran home to the family's trailer. (*Ibid.*) In overturning Juan's conviction for aiding and abetting first degree murder, the Ninth Circuit concluded that, unlike here, the record did "not support a conclusion that Juan H. left the murder scene in common 'flight' with Merendon." (*Id*. at p. 1277.) Further, the police never apprehended Merendon and, the Ninth Circuit concluded, the state had prosecuted Juan H. more harshly as a result. (*Id*. at p. 1279, fn. 16.)

*2. There is insufficient evidence to support O'Neill's conviction as an aider and abetter of the crimes involving Agent Cruz*

O'Neill claims that there is insufficient evidence to support his convictions on counts 2 through 5 on the theory that he directly aided and abetted Martinez in the commission of the crimes involving Agent Cruz. We agree. The People point to the facts that O'Neill and Martinez were members of the same gang and that O'Neill did not surrender when the Solara was stopped in the Madrona Street cul-de-sac, as evidence that O'Neill aided and abetted Martinez in resisting arrest, evading Agent Cruz and attempting to kill Agent Cruz by running him over. While the fact that O'Neill fled the scene of the shooting of Romero is evidence of his intent with respect to that crime, we do not agree that his failure to surrender, once cornered in the cul-de-sac, constitutes evidence that O'Neill intended to assist Martinez in the ensuing crimes. There was no evidence of any conduct or words on O'Neill's part that would demonstrate that he assisted or encouraged Martinez in the commission of these crimes.

Recognizing the lack of any evidence of O'Neill's conduct with respect to the offenses charged in counts 2 through 5, the People sought and obtained a jury instruction on the natural and probable consequences theory of aiding and abetting liability. In his closing argument, the prosecutor urged the jury to convict O'Neill on counts 2 through 5 based on the theory that the chain of events that occurred after Romero was shot was a natural and probable consequence of that shooting. The trial court instructed the jury that "[t]o prove that the defendants are guilty of [counts 2 through 5], the People must prove that: [¶] 1. The defendants are guilty of Attempted Murder as charged in Count One [the shooting of Romero]. 2. During the commission of Attempted Murder as charged in

27

Count One, a coparticipant in that Attempted Murder as charged in Count One, committed the crimes of Count[s 2 through 5] and 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of Count[s 2 through 5] were a natural and probable consequence of the Attempted Murder as charged in Count One."

The instruction went on to define a coparticipant as "the perpetrator or anyone who aided and abetted the perpetrator . . . " and a natural and probable consequence as "one that a reasonable person would know is likely to happen if nothing unusual intervenes." The instruction further stated that "[i]n deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the crimes of Count[s 2 through 5] were committed for a reason independent of the common plan to commit the Attempted Murder as charged in Count One, then the commission of Count[s 2 through 5] were not a natural and probable consequence of Attempted Murder as charged in Count One."

As discussed, "[a]ider-abettor liability exists when a person who does not directly commit a crime assists the direct perpetrator by aid or encouragement, with knowledge of the perpetrator's criminal intent and with the intent to help him carry out the offense." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407, citing *People v. Beeman, supra,* 35 Cal.3d at pp. 560–561.) "The liability of an aider and abettor extends also to the natural and [probable] consequences of the acts [the defendant] knowingly and intentionally aids and encourages." (*People v. Beeman, supra*, at p. 560; *People v. Prettyman* (1996) 14 Cal.4th 248, 260 (*Prettyman*).) "Under the natural and probable consequences doctrine,

28

an aider and abettor is guilty of not only the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the actual perpetrator. The defendant's knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator." (*People v. Miranda, supra,* 192 Cal.App.4th at pp. 407-408.)

The natural and probable consequences doctrine "is based on the recognition that 'aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion.' " (*Prettyman, supra*, 14 Cal.4th at p. 260.) In determining whether the nontarget offense committed by the defendant's confederate was a natural and probable consequence of the target crime the defendant aided and abetted, the question is not whether the defendant actually foresaw the confederate's commission of the nontarget offense, but whether, judged objectively, the commission of the nontarget crime was reasonably foreseeable. (*People v. Medina* (2009) 46 Cal.4th 913, 920; *People v. Miranda, supra*, 192 Cal.App.4th at p. 408.) Thus, "[l]iability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " (*People v. Medina, supra*, at p. 920.)

Further, the nontarget offenses " ' "must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be

29

reasonably apparent, and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design." ' [Citation.]" (*Prettyman, supra*, 14 Cal.4th at pp. 260-261.) " 'A "natural" consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. "Probable" means likely to happen.' " (*People v. Leon* (2008) 161 Cal.App.4th 149, 158.) The doctrine of natural and probable consequences is commonly applied, for example, where a "defendant assist[s] or encourage[s] a confederate to commit an assault with a deadly weapon or with potentially deadly force, and the confederate not only assault[s] but also murder[s] the victim" or "where a defendant assist[s] in the commission of an armed robbery, during which a confederate assault[s] or trie[s] to kill" the robbery victim. (*Prettyman*, supra, 14 Cal.4th at pp. 262-263.)

We agree with O'Neill that there was not substantial evidence to support a finding that he aided and abetted the offenses charged in counts 2 through 5 based on a natural and probable consequence theory. The actions that Martinez took once Agent Cruz began to pursue the Solara, specifically his decision not to surrender and the ensuing confrontation and attempt to run down Agent Cruz in the Madrona street cul-de-sac, cannot be considered to be objectively, reasonably foreseeable consequences of the shooting of Romero outside of Wild Woolly's bar. (See *Prettyman*, *supra*, 14 Cal. 4th at p. 268 ["a conviction may not be based on the jury's generalized belief that the defendant intended to assist and/or encourage unspecified 'nefarious' conduct"].) Further, Martinez's evasion of Agent Cruz, his reckless driving and his attempted murder of Agent Cruz are not crimes that can reasonably be deemed closely related to the target offense of

30

shooting Romero. Unlike a murder stemming from a planned assault with a deadly weapon, the collateral crimes here did not have a sufficiently "close connection" to the target crime to support a conviction for aiding and abetting based on a theory of natural and probable consequences. (*Id.* at p. 269 ["To trigger application of the "natural and probable consequences" doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed"].) The events that occurred after Romero was shot were not reasonably foreseeable for purposes of application of the natural and probable consequences doctrine. (See *People v. Leon*, *supra*, 161 Cal.App.4th at p. 161 [witness intimidation by firing a gun in the air not a natural and probable consequence of the target offenses of burglary or illegal possession of a firearm].)

The People maintain that common sense requires that one reject "the notion that it is not probable that someone would flee after having intentionally shot another person." This much is true. What was not probable, however, was the ensuing police chase resulting in Martinez turning into a cul-de-sac, and Martinez's attempt to kill Agent Cruz by driving the Solara directly at him. To apply the natural and probable consequences doctrine here would improperly stretch the notion of what conduct may be deemed reasonably "foreseeable and probable."[10]

---

[10]    We note the incongruity between the People's argument, which we accept, that O'Neill's and Martinez's sentences on count 5 (evading an officer with reckless driving) should not be stayed under section 654 because Martinez's "initial intent was to avoid apprehension by the police" but he "developed a separate intent to kill [Agent] Cruz," and their contention that the attempted murder of Agent Cruz was a natural and probable consequence of the shooting of Romero. The People's argument with regard to

31

Because we conclude that there was not sufficient evidence to support O'Neill's conviction based on a natural and probable consequence theory of aiding and abetting, it was also error for the court to instruct on this theory. (*People v. Nguyen, supra,* 21 Cal.App.4th at p. 528.) O'Neill's convictions on counts 2 through 5 are reversed.[11]

DISPOSITION

The judgment as to Martinez is modified to stay the 30-year minimum parole eligibility term under section 186.22, subdivision (b), and is otherwise affirmed. The judgment as to O'Neill on counts 2 through 5 is reversed and in all other respects, is affirmed. The trial court is directed to amend the abstract of judgment accordingly and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

AARON, J.

WE CONCUR:

NARES, Acting P. J.

McINTYRE, J.

---

Martinez's separate intents supports our conclusion that Martinez's "collateral criminal act[s were not] the ordinary and probable effect of the common design" to shoot Romero. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531, citing *People v. Kauffman* (1907) 152 Cal. 331, 335 and *People v. Durham* (1969) 70 Cal.2d 171, 182-183.) Rather, the collateral acts were "a fresh and independent product of the mind of [Martinez], outside of, or foreign to, the common design. (*Nguyen,* at p. 531.)

[11] Our reversal of O'Neill's convictions on counts 2 through 5 renders moot his remaining claims of sentencing error.